# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 07-60028** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **ROGER JOSEPH FONTENETTE** | * | **MAGISTRATE JUDGE HILL** |

## REPORT  AND RECOMMENDATION

Before the court is a Motion to Suppress filed by defendant, Roger Joseph Fontenette. [rec. doc. 18].  An evidentiary hearing was held on the motion.  Based on the evidence adduced at the hearing and the applicable jurisprudence, it is

**RECOMMENDED** that the motion to suppress be **GRANTED** with respect to the marijuana "cigar" and the 9 mm pistol discovered during the search of Fontenette's vehicle on September 15, 2006 and **DENIED** in all other respects.

## BACKGROUND

The defendant, Roger Joseph Fontenette, was indicted on multiple drug and firearms counts. Count 1 charges that Fontenette possessed with intent to distribute marihuana on April 3, 2005 in violation of 21 U.S.C. § 841(a)(1).  That charge stems from the traffic stop of a vehicle driven by Mickey Marcel Patt in which Fontenette was a passenger.  Count 3 charges that Fontenette possessed with intent to distribute cocaine on September 15, 2006 in violation of 21 U.S.C. § 841(a)(1).  That charge stems from the stop of a vehicle driven by Fontenette in which Fontenette's minor son, Dreland, and nephew, Keondre, were passengers.  Counts 4 and 5 charge Fontenette with being a felon

in possession of a firearm and with carrying a firearm during, and in relation to, a drug trafficking offense in violation of 18 U.S.C. § 922(g)(1) and 924(e) and 18 U.S.C. § 924(c)(1), respectively.  The firearm referenced in these charges was discovered during the search of Fontenette's vehicle on September 15, 2006.  Count 6 charges that Fontenette possessed with intent to distribute cocaine on February 14, 2007 in violation of 21 U.S.C. § 841(a)(1).  That charge stems from the search of apartment 203C, located at 201 High Meadows Boulevard, pursuant to a warrant issued by Judge Keaty of the Louisiana Fifteenth Judicial District Court.  Fontenette seeks to have the items seized in this search suppressed, arguing that they were obtained in violation of the Fourth Amendment.

## April 3, 2005 Traffic Stop

### *Summary of Facts and Testimony*

Officer Thomas Mercier, Lafayette City Police, testified that on April 3, 2005, while he was traveling eastbound on Simcoe Street in Lafayette, Louisiana, he was forced to stop his vehicle, because of  heavy traffic, adjacent to a customized candy red or maroon Cadillac driven by Mickey Patt.  The Cadillac was traveling westbound.  As the vehicles were stopped side by side, Officer Mercier heard loud music emanating from the Cadillac.  He also observed that neither Patt nor his passenger, Fontenette, were wearing seat belts.  Although Officer Mercier could not state the exact Lafayette City ordinance code number, he testified that it was his understanding that if he could hear music

emanating from a vehicle while he was within fifty feet of the vehicle, the vehicle was in violation of the local excessive noise ordinance. Because Officer Mercier was in heavy traffic heading in the direction opposite from Patt, he was unable to stop the Cadillac. Accordingly, Officer Mercier radioed the noise violation and a description of the vehicle to other officers working in the same area of the City so that one of those officers could stop the vehicle for the violation. Louisiana State Trooper James Benoit, who was at that time employed by the Lafayette Police Department, made the stop.

Trooper Benoit testified that after receiving Officer Mercier's radio request, he was able to identify the Cadillac approximately one car length in front of him. He observed neon lights, two large speakers ("woofers") and an amplifier in the trunk of the vehicle, but did not hear any sound emanating from the vehicle. As the Cadillac turned, Trooper Benoit also observed that neither the driver nor the passenger were wearing seatbelts. Trooper Benoit followed the Cadillac and made the traffic stop. Officer Mercier arrived at the scene shortly thereafter. Officer Mercier questioned the driver, Patt, while Trooper Benoit questioned the passenger, Fontenette.

Both Officers testified that, upon approaching the vehicle, they smelled the odor of burnt marihuana. Officer Mercier testified that, upon smelling the marijuana, he asked for permission to search the vehicle. When Patt refused, Officer Mercier called for a K-9 unit. The police dog arrived and while "sniffing" the exterior of the car, the dog "alerted" on the vehicle. Officer Mercier testified that once the dog "alerted," a full search of the

vehicle was conducted.  During the search, Trooper Benoit located two firearms hidden in the center console of the Cadillac.[1]

In addition to smelling burnt marihuana emanating from the Cadillac, Trooper Benoit also  observed two open alcoholic beverage cans on Fontenette's lap when he approached the vehicle.  After Fontenette exited the vehicle, Trooper Benoit conducted a pat-down for weapons.  He felt a bulge in Fontenette's right watch pocket, which, because of the smell of the smoke which had emanated from the vehicle, he suspected was marihuana.  Trooper Benoit then recovered a small bag of marihuana from Fontenette's right watch pocket.  A large amount of money was also found in Fontenette's left jeans pocket.  Fontenette was placed under arrest and seated in the back of Benoit's police unit.

Once Trooper Benoit was inside his vehicle with Fontenette, with the windows rolled up and the air conditioning not working, Benoit again smelled marihuana which he characterized as "unburnt."  Accordingly, Benoit took Fontenette out of the vehicle and

---

[1]Defense counsel conceded at the hearing that Fontenette did not have standing to contest the search of Patt's vehicle.  *See United States v. Roberson,* 6 F.3d 1088, 1093 (5th Cir.1993) (passengers have no standing to challenge the search of a car's contents).  Accordingly, the instant challenge is directly solely at the legality of the stop and search of Fontenette's person. *See United States v. Grant,* 349 F.3d 192, 196 (5th Cir. 2003) (internal citations omitted) ("'the search of an automobile does not implicate a passenger's Fourth Amendment rights, [however] a stop results in the seizure of the passenger and driver alike.' Therefore, while a passenger of a stopped automobile does not have standing to challenge the search of a car, he does have standing to challenge the seizure of his person as unconstitutional.")

did a second quick pat down.  Later, Benoit conducted a more complete search, pulled

Fontenette's pants down, and found a larger bag of marijuana in Fontenette's pants.

With respect to this incident, Fontenette testified that there was "light music" in

Patt's Cadillac, but that the music was not loud as he and Patt were talking to each other

and could easily hear each other.  He further testified that both he and Patt were wearing

seatbelts.  After being taken out of the vehicle, Fontenette stated that he was searched.  In

response to Fontenette's question as to why he was being searched, Fontenette said that

the Officer responded that "he got his reasons."

This traffic stop was the subject of a Motion to Suppress previously filed on behalf

of Mickey Marcel Patt.  Following a hearing and issuance of Report and

Recommendation by Magistrate Judge Methvin, Judge Doherty denied Patt's Motion to

Suppress by Order dated November 6, 2006.  *USA v. Patt,* 6:05cr60047 (W.D.La. 2005),

rec. docs. 85 and 88.

### *Law and Analysis*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."

Temporary detention of individuals during the stop of an automobile by the police, even if

only for a brief period and for a limited purpose, constitutes a "seizure" of "persons"

within the meaning of the Fourth Amendment.  *Whren v. U.S.*, 517 U.S. 806, 809-10, 116

S.Ct. 1769, 1772 (1996) (citations omitted).  Thus, an automobile stop is subject to the

constitutional imperative that it not be "unreasonable" under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Whren,* 517 U.S. at 809-10 (citations omitted).

In the instant case, Officer Mercier testified that one of the reasons that he radioed for assistance in stopping Patt's vehicle was the loud music emanating from the vehicle's trunk. To rebut Officer Mercier's testimony that the music emanating from Patt's vehicle was loud, Fontenette testified that the music was not loud because he and Patt were talking inside the vehicle.

Lafayette City-Parish Ordinance number 86-5, effective at the time of the stop in question, provides that it is unlawful to operate a "vehicle on any public property in such a manner as to emit sound from music amplification . . . equipment which is . . . plainly audible at a distance of 50 feet in any direction . . . ." *See* Ordinance No. O-109-2003, 86-5(d). "Plainly audible" is defined as any sound that can be detected by a person using his or her unaided hearing faculties." *Id.* at 86-5(c).

The Court finds that there was insufficient evidence produced at the hearing to justify the traffic stop for violation of the excessive noise ordinance, Lafayette City-Parish Ordinance number 86-5. Mercier testified that he heard the music when he was stopped right next to the Cadillac, clearly within fifty feet of the music. Mercier testified, in discussing the local ordinance, that if music is heard from fifty feet away, that is a

violation. Mercier went on to testify that a violation was "implied" here, because he was stopped next to the Cadillac.

The ordinance in question prohibits excessive noise emanating from a vehicle, which the ordinance defines as "music amplification" . . . "plainly audible at a distance of 50 feet in any direction." This ordinance prohibits playing music loudly enough to be heard fifty feet away from the music source. The ordinance does not prohibit playing music loudly enough to be heard *less* than fifty feet away from the music source.

Officer Mercier testified that since he could hear the music being played while stopped next to the Cadillac (clearly within fifty feet), that it was "implied" that the music could be heard fifty feet away. The Court squarely rejects that implication.

There was no evidence that the music emanating from the Cadillac could be heard fifty feet away from the car. Trooper Benoit testified that when he stopped the Cadillac he could not hear any music at all.

Accordingly, the traffic stop of the Cadillac, driven by Patt in which Fontenette was riding, cannot be justified on the violation of the excessive noise ordinance. However, that does not end the inquiry.

Both Mercier and Benoit testified that neither Patt nor Fontenette, were wearing seat belts. Louisiana Revised Statute 32:295.1 requires the driver and each front seat occupant of a passenger car to wear a seat belt while the vehicle is in motion, and further provides probable cause for the stop of a vehicle for violations of the statute "based upon

a law enforcement officer's clear and unobstructed view of a person not restrained as required by this Section." La.R.S. 32:295.1(A)(1), (B) and (F). Fontenette attempted to rebut the officers' testimony on this point, testifying that he was wearing his seatbelt, and suggesting that the officers could not see into the vehicle because the windows were tinted. However, Officer Mercier was stopped adjacent to the vehicle and thus had a clear and unobstructed view of the interior of the vehicle. Further, Trooper Benoit testified that his headlights illuminated the vehicle as it turned.

The undersigned finds that the testimony of Officers Mercier and Benoit was credible on this point, and that both officers saw that Patt and Fontenette were not wearing seatbelts as required by Louisiana law. Therefore, the undersigned finds that the traffic stop of Patt's vehicle, and thus the seizure of Fontenette, was reasonable and lawful under the Fourth Amendment, because the officers had probable cause to stop the vehicle for the seatbelt violation. *See United States v. Castro*, 166 F.3d 728 (5th Cir. 1999) (officer had reasonable suspicion to stop the vehicle in question where the vehicle was speeding and the defendant and his passenger were not wearing their seat belts).

The undersigned additionally finds that the initial search of Fontenette's person was constitutionally permissible. The purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *United States v. Garza*, 921 F.2d 59, 60 (5th Cir. 1991) *citing Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d

930 (1967). The search of Fontenette was without a warrant. Generally, warrantless searches are justifiable only if they fall under one of the " 'specifically established and well-delineated exceptions' to the general warrant requirements." *Id. quoting United States v. Cisneros-Mireles*, 739 F.2d 1000, 1002 (5th Cir.1984) *quoting Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971)). The initial frisk of Fontenette fell within the exception to warrantless searches recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Under *Terry*, a law-enforcement officer may briefly detain and frisk an individual, as long as the officer has a reasonable, articulable suspicion of criminal activity. *United States v. Darensbourg,* 236 Fed.Appx. 991, 993-994 (5th Cir. 2007 ) (unpublished) *citing Terry*, 392 U.S. at 30. "The officer need not be absolutely certain that the individual is armed; the issue is whether *a reasonably prudent man* in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id. citing Terry,* 392 U.S. at 27 (emphasis added). Accordingly, in order to determine whether reasonable-suspicion exists, a court must consider the totality of the circumstances. *Id. citing United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (internal citations and quotation marks omitted).

If a weapons search is lawfully made pursuant to *Terry*, officers may seize nonthreatening contraband detected during the protective pat-down if the officer is able to ascertain the identity of the contraband when he initially touches the object. *See United States v. Pugh,* 251 F.3d 157 (5th Cir. 2001) (unpublished) *citing Minnesota v. Dickerson*, 508 U.S. 366, 373, 375-76, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

Here, the circumstances surrounding the frisk of Fontenette would lead a reasonably prudent police officer to conclude that criminal activity was afoot. Both officers detected the odor of burnt marihuana emanating from the vehicle.[2] Trooper Benoit testified that he conducted the pat-down of Fontenette "for weapons." Although Trooper Benoit acknowledged that Fontenette had not threatened him, nor made any threatening motions, the totality of the circumstances of this case are objectively sufficient for a reasonable officer to conclude that he might be dealing with a person who may be armed and presently dangerous, justifying a pat-down to secure the officer's safety.

The traffic stop occurred at night, off of a busy street. Both officers detected the likely presence of illegal drugs. A reasonable officer would be within his constitutional authority to conduct a pat-down for his personal safety, given that drugs and firearms are commonly found in connection with each other. *See United States v. Majors*, 328 F.3d 791, 795 (5th Cir.2003) ("[F]irearms are tools of the trade for those engaged in illegal

---

[2] Fontenette did not testify to the contrary, and presented no other contrary evidence

drug activities." (internal citations and quotation marks omitted)).  Thus, the frisk of Fontenette's person was lawfully made pursuant to *Terry*.[3]

Trooper Benoit testified that  while he was conducting the pat-down search of Fontenette's clothing, he touched a bulge in Fontenette's jeans.  Based on the officer's experience and the odor emanating from Patt's vehicle, he immediately suspected that the object was marihuana.  At that point, Trooper Benoit had probable cause to believe that Fontenette was in possession of contraband, so he was entitled to make an arrest and seize it.  *See Pugh, supra. citing United States v. Cooper,* 43 F.3d 140, 148 (5th Cir.1995).

The subsequent searches of Fontenette's person, following his lawful arrest, also passes constitutional muster as searches of Fontenette's person incident to his arrest. *See Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034 (1969) (recognizing that following a lawful arrest, police may search the arrestee's person and the area within his immediate control); *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467 (1973) (holding that "in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a

_____

[3]The undersigned also notes that, while the initial stop was to investigate traffic violations, given the odor of burnt marihuana which was immediately detected by the officers when they approached the vehicle, a reasonable officer, such as Trooper Benoit, would have an additional articulable, reasonable suspicion that one of the occupants of the vehicle had illegal drugs on his person, providing further support for the detention and frisk of Fontenette. *See United States v. Grant*, 349 F.3d 192, 197 (5th Cir. 2003). "Reasonable suspicion exists when the detaining officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.* (citations and internal quotations omitted).

reasonable search under that Amendment . . . . It is the fact of the lawful arrest which establishes the authority to search . . .”).

For the reasons set forth above, the undersigned concludes that the stop of the Cadillac in which Fontenette was a passenger, the initial pat-down of Fontenette and subsequent post-arrest searches of Fontenette's person were lawful. Accordingly, the contraband seized from Fontenette during this incident should not be suppressed.

**September 15, 2006 Traffic Stop**

*Summary of Facts and Testimony*

Officer Scott Poiencot, Lafayette City Police Metro Narcotics, testified that on September 15, 2006, he was contacted by a confidential informant (“Chad”) who stated that he (Chad) had purchased cocaine from a black male named “Roger”, and that Roger was on his way to Chad's home to deliver the drugs. Poiencot testified that he knew Chad before that date, however, he had not previously used Chad (who was a suspect in an unrelated case) as a confidential informant. When Poiencot arrived at the informant's house, Poiencot observed a black male leaving the premises driving a red car. The informant advised Poiencot that the driver of the red car was “Roger”. After the red car left, Poiencot reimbursed the informant for the cost of the ounce of powder cocaine he had just purchased from “Roger” and seized the cocaine.

After becoming concerned that Chad might use this money to order more cocaine, Poiencot returned to the informant's house and told the informant to order more cocaine

and to have "Roger" deliver the cocaine to the informant's house. He told the informant that the plan was to have Chad not be home when "Roger" arrived with the cocaine; Chad was to telephone "Roger" and then tell him to deliver the drugs to a different location, at which time a traffic stop would be conducted.

While Poiencot was conducting surveillance on the informant's residence, he observed a large crew-cab truck arrive and park in front of the informant's house. The informant then called Poiencot to advise that "Roger" was at his house. Based on these circumstances, Poiencot concluded that the truck he was observing contained "Roger" and the cocaine. Poiencot then radioed a description of the vehicle to other officers so that a uniformed officer could conduct a traffic stop of the vehicle.

Lafayette City Police Officer Brent Taylor testified that he was given a description of a vehicle, a Quad Cab four-wheel-drive black Dodge pick-up truck, and was asked to conduct visual surveillance on the vehicle to ascertain if he could develop probable cause to make a traffic stop. Officer Taylor located the truck in the 3100 block of Johnson Street. While following the truck, Officer Taylor "paced" the truck and determined that the truck was speeding, traveling 47 miles per hour in a 40 mile per hour zone. Taylor did not initially see any license plate on the vehicle; however, as he stopped the vehicle, Taylor noticed that there was a temporary license plate improperly displayed in the back window of the truck. Taylor activated his lights and stopped the truck. Taylor testified that he stopped the vehicle for excessive speed and improper display of a license plate.

Taylor called for back-up. Initially, he stated that it was "not long" before back-up arrived, then he stated it took "several minutes" meaning "approximately three". Agent Kent Goolsby, Lafayette Metro Narcotics, arrived at the scene. He testified that Agent Poiencot had asked him to go to the scene, and that he arrived at the scene of the stop "seconds, maybe a minute" after the stop. When told that Taylor said about three minutes had elapsed, Goolsby stated that he could not state exactly how long after the stop he arrived, but that "it was a short period of time." Agent Goolsby testified that he went to the scene not only because another officer was needed as back-up for the traffic stop, but also because he wanted to investigate the potential narcotic activity and determine whether the vehicle contained drugs as was suspected.

Officer Taylor observed two children in the vehicle, ages nine and three, one of whom was not properly secured in a child safety seat. The driver of the truck exited the vehicle and approached Officer Taylor's unit. Officer Taylor told the driver, Fontenette, why he had stopped him and asked the driver for his driver's license. Fontenette stated that he did not have his driver's license on his person.

Officer Taylor, who at the time had been a canine handler for the Lafayette Metro Narcotics Unit for at least two years, asked Fontenette for permission to search the vehicle. Taylor testified that it was his routine practice to request permission to search essentially every vehicle that he stopped for traffic violations. Fontenette refused to

consent to the search.  Officer Taylor then walked his dog around the vehicle.  Taylor testified that the dog "alerted" twice.

After the dog "alerted", the truck was searched.   Agent Goolsby found a partially burnt marijuana cigar in the ashtray and a loaded, nine millimeter semi-automatic pistol in the center console.  Goolsby then placed Fontenette under arrest.  Officer Taylor testified that as he was searching the back seat of the vehicle where the children had been seated, he smelled a very strong odor of cocaine.  Taylor explained that while he was not an expert and had not been trained on how to detect the odor of cocaine, if "you've been around it enough and especially in large quantities, you know what the smell is."

Agent Goolsby testified that even before the search, Fontenette seemed nervous and "overly concerned" about getting the two children away from the scene.  Considering the cigar and gun found in the vehicle, Fontenette's nervousness and what Goolsby believed to be Fontenette's "over-concern" about the children, Agent Goolsby testified that he thought they were "missing something", and that it was possible that the children may have had something on their person of evidentiary value.

Officer Taylor told Goolsby that he, Taylor, had spoken with the nine year old child, and that the child told Taylor that "he had something bad in his pocket" and that it had been given to him by his uncle, Fontenette.  When Taylor asked the child to show him what it was, the child started to retrieve a plastic bag out of his pocket which contained something white.  After Officer Taylor relayed this information to Agent Goolsby, who

asked the child if he had something on him.  When the child stated that he did, Goolsby

asked the child to show it to him.  The child then removed a cellophane bag containing

cocaine from his pocket.  Goolsby asked the child if he knew what it was, and the child

responded that he knew it was "something bad."  When Goolsby asked if his uncle Roger

had given the bag to him, the child responded "yes."

*Law and Analysis*

The Fourth Amendment protects individuals from unreasonable searches and

seizures. Traffic stops are considered seizures within the meaning of the Fourth

Amendment. *United States v. Grant*, 349 F.3d 192, 197 (5th Cir. 2003) *citing Delaware v.*

*Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) and *United States v.*

*Jones*, 234 F.3d 234, 239 (5th Cir. 2000).  Because traffic stops are considered more

similar to investigative detentions than formal arrests, the legality of traffic stops are

analyzed for Fourth Amendment purposes under the standard articulated in *Terry v. Ohio*,

392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).  *Id. citing Berkemer v. McCarty*, 468

U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). This standard is a two-tiered

reasonable suspicion inquiry: 1) whether the officer's action was justified at its inception,

and 2) whether the search or seizure was reasonably related in scope to the circumstances

that justified the stop in the first place. *Id. citing Terry*, 392 U.S. at 19-20, 88 S.Ct. 1868,

20 L.Ed.2d 889,  *Jones*, 234 F.3d at 240, *United States v. Dortch*, 199 F.3d 193, 198 (5th

Cir.1999), *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir.1993) and *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir.1993).

In addition, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id. quoting Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion. *Id.* "At that point, continuation of the detention is no longer supported by the facts that justified its initiation." *Id. quoting Shabazz,* 993 F.2d at 436.

However, when there is additional reasonable suspicion supported by articulable facts, continued detention beyond the initial purpose of the stop is permissible. *Id.* at 196-197 *citing United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir.2003). There is "no constitutional stopwatch on traffic stops." *United States v. Brigham,* 382 F.3d 500, 511 (5th Cir. 2004) (*en banc*). The relevant question in assessing whether a detention extends beyond a reasonable duration is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id.* at 511 (citations omitted).

Reasonable suspicion exists when the detaining officer "can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the search and seizure].' " *Grant,* 349 F.3d at 196 *citing United*

*States v. Santiago*, 310 F.3d 336, 340 (5th Cir.2002) *quoting United States v. Thomas*, 12 F.3d 1350, 1366 (5th Cir.1994).  Reasonable suspicion requires "some minimal level of objective justification for making the stop", but "that level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence" and is "obviously less demanding than for probable cause." *Alabama v. White*, 496 U.S. 325, 329-330, 110 S.Ct. 2412 (1990).  Thus, "reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Id.* at 330.

When making a reasonable-suspicion determination, the Fifth Circuit has repeatedly stated that courts must look at the "totality of the circumstances" of each case. *Grant,* 349 F.3d at 197 (citations omitted); *Brigham,* 382 F.3d at 507.  Because the touchstone of Fourth Amendment analysis is reasonableness, the Fifth Circuit has rejected any "bright-line rules, instead emphasizing the fact-specific nature of the inquiry." *Brigham,* 382 F.3d at 507.  Furthermore, reasonable suspicion may exist on the collective knowledge of the police.  *United States v. Allison*, 616 F.2d 779, 782 (5th Cir. 1980); *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759-760 (5th Cir. 1999).

During the course of a traffic stop, police officers may request to examine a driver's license and vehicle registration.  The police may also question the driver on a subject unrelated to the purpose of a routine traffic stop.  *Shabazz*, 993 F.2d at 436 ("we reject any notion that a police officer's questioning, even on a subject unrelated to the

purpose of the stop, is a Fourth Amendment violation). There is no *per se* or inflexible rule on the timing, content or sequence of an officer's questioning. *Id.* at 510-511.

Fontenette apparently does not contest the first prong of the *Terry*-stop inquiry, that is, that the stop was justified at its inception.[4] Fontenette offered no evidence to contradict Officer Taylor's testimony that he, Fontenette, was speeding and had an improperly displayed temporary licence tag.[5] The defendant argues that the officers exceeded the scope of the traffic stop and violated Fontenette's constitutional rights by continuing to detain him longer than necessary to effectuate the purpose of the stop. He argues that his continued detention extended beyond the scope of the original reason for the stop, that is, the traffic violations. Fontenette challenges the second prong of the *Terry* analysis, "whether the officer's action was reasonably related in scope to the circumstances which justified the interference in the first place." *See Shabazz*, 993 F.2d at 431.

---

[4]A police officer's ulterior motive does not invalidate objectively justifiable behavior under the Fourth Amendment and, hence, police are allowed to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop. *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Likewise, the Fifth Circuit has foreclosed suppression challenges based on pretext, holding that "where the officers have taken no action except that which the law objectively allows, their subjective motives in doing so are not even relevant to the suppression inquiry." *U.S. v. Causey*, 834 F.2d 1179, 1185 (5th Cir.1987) (*en banc*). Thus, any suggestion that the stop was a pretext for the officers' primary purpose of drug interdiction is pretermitted by the legitimacy of the stop for the traffic violations. *Id.*; *See also U.S. v. Roberson*, 6 F.3d 1088, 1092 (5th Cir.1993) (suppression challenge based on pretext eliminated when seizure has otherwise legal basis), *cert. denied*, 114 S.Ct. 1322 (1994).

[5]*See* La.R.S. 32:61 (Maximum Speed Limit) and La.R.S. 47:507 (Display of License Plate).

The government argues that under the collective knowledge doctrine, Officer Taylor and Agent Goolsby properly initiated the stop based on Agent Poiencot's reasonable suspicion, which was communicated directly to Agent Goolsby, who relayed the information to Officer Taylor. The government also asserts the added justification for the traffic stop based on the traffic violations found by Officer Taylor. Thus, the government argues that Fontenette's detention was within the scope of the circumstances which justified the stop in the first instance, both the traffic violations and the suspected illegal drug trafficking activity.

It is clear that the initial detention of Fontenette was justified. Officer Taylor had reasonable suspicion and probable cause to stop Fontenette's vehicle based on the reasonable suspicion of Agent Poiencot which was communicated to him through Agent Goolsby, as well as his personal observation of the traffic violations. *See Allison* and *Ibarra-Sanchez, supra*.

Thus, the issue to be decided is whether or not the detention of Fontenette by the police exceeded the time reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion based on articulable facts within the officer's professional judgment that emerges during the stop. *United States v. Brigham*, 382 F.3d 500, 512 (5th Cir. 2003). Additionally, the court must decide whether the search of the truck was based on probable cause, since Fontenette refused to give the police permission to search the truck.

Officer Taylor testified that it was his routine practice, on essentially *every traffic stop*, to both ask for permission to search the vehicle which he had stopped and also to "run" his drug dog on the stopped vehicle. After Fontenette informed Officer Taylor that he, Fontenette, did not have a valid driver's license on his person, Taylor asked Fontenette for permission to search the truck. Fontenette refused that permission. Thereafter, Taylor "ran" his dog around the truck to see if the dog would alert.

It is clear that a dog "sniff" does not constitute a search under the Fourth Amendment. *Dortch*, 199 F.3d at 197 *citing United States v. Seals*, 987 F.2d 1102, 1106 (5th Cir. 1993). A positive alert by a drug detection dog creates probable cause for a search of a vehicle. *United States v. Sanchez-Piña* 336 F.3d 431, 444 (5th Cir. 2003). In this case, Officer Taylor testified that his dog "alerted" on the truck. Thereafter, once Officer Goolsby arrived, the truck was searched and a partially burnt marijuana "cigar" and a loaded 9 mm semiautomatic pistol was found in the truck.

The burden is on the government to prove a valid exception to the search warrant requirement in order for a warrantless search to be constitutionally valid. *United States v. Vickers*, __ F.3d __, 2008 WL 3319042, *2 (5th Cir., Aug. 12, 2008) (where the police acted without a warrant, the burden is on the Government to prove that the search was valid), *citing United States v. Waldrop,* 404 F.3d 365, 368 (5th Cir.2005). Had the dog not "alerted" on the truck, there would have been no probable cause to search. Thus, the

court's decision on the constitutional validity of the search turns on the credibility of Officer Taylor. If Officer Taylor's testimony that the dog "alerted" on the truck is credible and believed by the court, then it follows that the search was constitutionally permissible. If, however, the Court finds officer Taylor's testimony not credible, then the search of the truck, conducted without probable cause, was unconstitutional and the items found during the search must be suppressed.

Unfortunately, the Court finds Officer Taylor's testimony to be incredible and not believable. Officer Taylor testified that while he was searching the truck he smelled "the strong odor of cocaine" in an area of the truck where the nine-year-old child *had been sitting*. This child later was found to have a plastic bag of cocaine in his pocket. Thus, Officer Taylor testified not only that he could smell cocaine, but that he could smell where cocaine *had previously been*.

Officer Taylor acknowledged having no training in detecting the odor of cocaine, is not certified as an expert in detecting the odor of cocaine, has never testified in court as an expert who is able to detect the odor of cocaine, and knows that the police department does not recognize the expertise of an officer in detecting the odor of cocaine. Taylor acknowledged that there was no scientific method to use to detect the odor of cocaine and that he had never been taught how to identify the odor of cocaine. His only explanation was that he had been around enough, especially when large quantities of cocaine was involved, to know what the smell was like. Here, the amount cocaine was small enough

to fit into a small bag and then be placed in a child's pocket. Even more incredulously, Officer Taylor testified that he smelled the cocaine in the truck *even after the child was no longer in the truck*.

In over 35 years as a street police officer, federal prosecutor, lawyer in private practice and now Magistrate Judge, the undersigned has never heard anybody say that they could smell cocaine, which, of course, is odorless, much less testify they could smell where cocaine (which was contained in a cellophane bag) *had been*. Simply speaking, the Court finds Officer Taylor's testimony to be incredible.

Officer Taylor, in describing the way in which his dog "alerted" on the truck testified that the "alert" was a change in the dog's breathing and a change in the body posture of the dog. Officer Taylor testified that he thought the dog was about to scratch on the truck because the dog raised its paw, but that he pulled the dog back because he knew what "she was about to do." There is no other testimony in the record regarding the "alert" of the dog.

Given Officer Taylor's incredible testimony regarding his smelling the cocaine, the court cannot find credible Officer Taylor's testimony that he "knew" what the dog was going to do when it raised its paw. On the facts presented, the Court finds that Officer Taylor's testimony was incredible and unbelievable. Accordingly, the undersigned finds that the government has failed to prove that the search of the truck was pursuant to a valid exception to the warrant requirement. Therefore, the court finds that the search of the

truck which resulted in the seizure of the marijuana "cigar" and the 9 mm pistol was unconstitutional and violative of the Fourth Amendment. Thus, the marijuana "cigar" and the 9 mm pistol should be suppressed.

The only other item seized by the police during this stop was the cocaine which was recovered from the pocket of the nine-year-old nephew of the defendant. Officer Taylor spoke to the child who, apparently, started to pull a cellophane bag containing the cocaine out of his pocket. Officer Taylor apparently stopped the child from doing so, and alerted Officer Goolsby who then retrieved the cellophane bag from the child which contained cocaine. At this time, the child was outside of the truck.

Counsel for Fontenette makes no specific argument, and cites no legal authority, for why this cocaine should be suppressed. Apparently, counsel simply relies on his argument that the duration of Fontenette's detention at the scene of the traffic stop exceeded the time reasonably necessary to effectuate the purpose of the stop, in the view of defense counsel, issuing tickets for the traffic violations.

The burden is on the movant to show that he has "standing" to assert the constitutional invalidity of the search and seizure of which he complains. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421 (1978) (because Fourth Amendment rights are personal rights which may not be vicariously asserted, a person aggrieved by an illegal search and seizure only through introduction of damaging evidence secured by a search of

a third person has not had his Fourth Amendment rights infringed and, accordingly, should not benefit from the exclusionary rule).

Furthermore, a person does not have a reasonable expectation of privacy in items which he has abandoned. *United States v. Barlow*, 17 F.3d 85, 88 (5th Cir.1994) (One cannot, manifest a reasonable expectation of privacy in an item once it has been abandoned . . . the test for determining when an object has been abandoned is one of intent, which may be inferred from words spoken, acts done, and other objective facts.). *See also United States v. Compton*, 704 F.2d 739, 741 (5th Cir.1983) (Compton argues that the initial arrest was invalid and that the evidence obtained from the trash should have been suppressed. The legality of the initial detention or arrest is of no aid to Compton. Compton has no standing to contest the seizure of the drugs from the trash, having abandoned the bag.).

The facts clearly show that the bag of cocaine was in the pocket of Fontenette's nine-year-old nephew. Either Fontenette put it there, as the child told the police, or someone else did. If the child told the police the truth, that is, that Fontenette put the cocaine in his pocket, Fontenette abandoned the cocaine and therefore does not have standing to contest the search. If, on the contrary, someone else put the cocaine into the child's pocket, Fontenette still lacks standing to contest the seizure of the child, and the subsequent seizure of the cocaine.

In either case, the defendant, Fontenette, has no standing to contest the constitutional validity of the seizure of the cocaine from the child. The cocaine was seized lawfully, and no Fourth Amendment right of the defendant was violated. The cocaine should not be suppressed.

## February 14, 2007 Search

### *Summary of Facts and Testimony*

On February 14, 2007, the police executed a search warrant at apartment 203C, 201 High Meadows Boulevard.[6]

With respect to his standing to challenge the search of the apartment, Fontenette testified that the apartment was a "hang-out spot" where he and several other people would go. He testified that he used the apartment "occasionally" when he wanted to get away from his girlfriend, apparently to entertain other women. The normal amount of time he would use the apartment was "a few hours, maybe an hour if that." Fontenette admitted that he never spent the night in the apartment. At certain times Fontenette was denied access to the apartment when someone else wanted privacy, and, at other times, Fontenette might deny someone else access if he wanted privacy. Fontenette claimed that

---

[6]In his original Motion, Fontenette challenged the search as performed without a warrant. However, following a response by the government in which the government asserted the search was pursuant to a warrant issued by Judge Keaty of the Fifteenth Judicial District Court, Fontenette changed his position during the hearing, arguing that the warrant was based on a "bare bones" affidavit which is so lacking in indicia of probable cause as to render faith in it entirely unreasonable.

he did not know who rented the apartment, and further claimed that he did not know who it was that let him use the apartment.

Fontenette admitted that he did not have a key to the apartment at all times. When he wanted to use the apartment he would get the key from "different people", and when he was done using the apartment he would give it to someone else. Fontenette was very evasive as to where he obtained a key for the apartment, initially stating that he got the key from Mickey Patt, but then admitting that he didn't know if Patt was out of jail at the time of the challenged search. He also claimed that he got the key from "Johnny", "Joe", or "Willy"; Fontenette said he did not know any last names, addresses or phone numbers, despite his claim that he would call these persons to get the key. Fontenette also testified that he would get the key from unnamed people at "the club."

It is undisputed that, at the time the search warrant was executed on the apartment, Fontenette was not inside the apartment. Moreover, it is undisputed that during the search, cocaine was found inside a vacuum cleaner bag in the apartment.

*Law and Analysis*

The initial question is whether Fontenette may properly challenge the search of the apartment and claim the protection of the Fourth Amendment. For the reasons which follow, the undersigned concludes that he may not.

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *See also Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 974 (1968) (the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure."). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id*. at 134 (citations omitted). "And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." *Id*. (citations omitted).

To challenge the search of apartment 203C, Fontenette must demonstrate that he had a legitimate expectation of privacy in the place searched, and that his expectation was reasonable. *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998); *United States v. Ibarra*, 948 F.2d 903, 905 (5th Cir. 1991).

A person has an expectation of privacy protected by the Fourth Amendment if he has a subjective expectation of privacy, and if society is prepared to recognize that expectation as objectively reasonable. *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). In assessing the reasonableness of

an individual's expectation of privacy, no one factor is invariably determinative. *See United States v. Haydel,* 649 F.2d 1152, 1154 (5ᵗʰ Cir. 1981) *citing Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

The United States Supreme Court has held that overnight guests generally have a reasonable expectation of privacy in their host's home. *Minnesota v. Olson*, 495 U.S. 91, 96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). The United States Court of Appeals for the Fifth Circuit has also held that "an expectation of privacy in the home of another" will be protected "when it is based on a visit which represents 'a longstanding social custom that serves functions recognized as valuable by society.' " *United States v. Vega*, 221 F.3d 789, 798 (5th Cir.2000) *quoting Olson*, 495 U.S. at 98). Thus, "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Carter*, 525 U.S. at 90. *See also United States v. Meyer*, 656 F.2d 979, 981 (5th Cir.1981) *citing Rakas*, at 142-143 (Mere presence on the searched premises, by invitation or otherwise, is insufficient in itself to create a protectable expectation of privacy).

 Here, Fontenette testified that he was occasionally in the apartment of an unknown renter for, at most, a few hours at a time with the permission of the renter. Fontenette clearly did not regularly reside at the apartment, was neither a co-tenant nor co-lessee of the apartment, and has failed to offer any evidence that he was ever an overnight guest at the apartment such that he had a legitimate privacy interest in the

apartment. *Olson*, 495 U.S. at 98. Moreover, Fontenette has failed to offer any evidence that he kept any personal belongings in the apartment. Fontenette has offered no credible evidence that he was authorized to be at the apartment on his occasional visits by a person with capacity to grant proper permission for its use. Not only was Fontenette unable to provide the court with the name of the renter, he was also unable to provide the court with the full names, addresses or telephone numbers of those persons from whom he obtained a key to the apartment. Indeed, the court finds Fontenette's testimony on these points entirely incredible.

Further, although Fontentte claimed that he had the ability to exclude others from the apartment when he wanted privacy, given his inability to demonstrate that his presence was authorized in the first instance, his admission that he did not possess his own key to the apartment at all times, as well as his testimony that he was excluded by others when those other unidentified persons wanted privacy, all contradict his claim of unencumbered access. The undersigned cannot find that Fontenette exercised the requisite control over the apartment for his assertion of a legitimate privacy interest in the apartment. To the contrary, Fontenette's testimony established the opposite; the apartment was used by so many persons that the only person who could possibly expect privacy in the apartment was a person who was actually present in the apartment. Again, Fontenette *was not present* when this search was conducted.

Finally, the undersigned is not prepared to recognize Fontenette's visits to the apartment to evade his girlfriend while entertaining other women as "a longstanding social custom that serves functions recognized as valuable by society" which deserves the protections of the Fourth Amendment. *Vega*, 221 F.3d at 798 *quoting Olson*, *supra.*

Fontenette seeks to analogize his position to that of the defendant in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The facts before this court are significantly different from those presented in *Jones*, and the undersigned therefore finds that *Jones* does not support Fontenette's position. In *Jones*, the defendant was present at the time of the search of an apartment which was owned by his friend, whom the defendant was able to identify. The identified friend had given Jones permission to use the apartment and a key to it, with which Jones had admitted himself on the day of the search. Jones had a suit and shirt at the apartment and had spent the night there, even though his home was elsewhere. At the time of the search, Jones was the only occupant of the apartment because the lessee was away for a period of several days. *Id*. at 259. Thus, except with respect to his identified friend and owner of the apartment, Jones had complete dominion and control over the apartment and could at any given time exclude others from it. *See Rakas*, 439 U.S. at 149. Under these circumstances, the Court found that unlike a "casual visitor" to the apartment, the defendant had a legitimate expectation of privacy in the apartment, permitting him to object to the lawfulness of the search. *See Rakas*, 439 U.S. at 141-143 (explaining the rationale of *Jones* while rejecting

31

the phrase "legitimately on the premises" coined in *Jones* as too broad a gauge for Fourth Amendment rights).

For those reasons previously stated, Fontenette's position is more akin to the "casual visitor" which the *Rakas* court found possessed a legally insufficient interest in the searched premises to contest the government's intrusion, and closer to that of "one simply permitted on the premises" found by the *Carter* Court not to have the authority to claim the protection of the Fourth Amendment in the home of another. While the defendant in *Jones* could legitimately expect privacy in the areas which were the subject of the search and seizure he sought to contest, no such showing has been made by Fontenette with respect to the apartment in which incriminating evidence was seized in this case, especially since Fontenette was not present at the time of the search.

For the foregoing reasons, the undersigned finds that Fontenette has not met his burden of showing that he had a legitimate, reasonable expectation of privacy in apartment 203C, located at 201 High Meadows Boulevard. Therefore, the undersigned finds that Fontenette may not claim the protection of the Fourth Amendment to challenge the search of the apartment.

For the above reasons, **IT IS RECOMMENDED** that the defendant's Motion to Suppress [rec. doc 18] should be **GRANTED** with respect to the marijuana "cigar" and the 9 mm pistol discovered during the search of Fontenette's vehicle on September 15, 2006 and **DENIED** in all other respects. .

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

THUS DONE AND SIGNED in Lafayette, Louisiana, August 25, 2008.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE